COURT OF CHANCERY
OF THE
STATE OF DELAWARE

DANIELLE GIBBS
MAGISTRATE IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Date Submitted: July 16, 2025
Date Decided: October 28, 2025

**BY FILE & SERVEXPRESS**
Timothy Ferry, Esquire
Ferry Joseph, P.A.
1521 Concord Pike, Suite 202
Wilmington, DE 19803

**VIA U.S. MAIL AND EMAIL**
Myesha Moorefield
2307 N. Market Street
Wilmington, DE 19802
**mariebosslady6@icloud.com**

> Re: *IMO Estate of Reginald E. Watson, Sr.*,
> C.A. No. 2025-0063-DG

Dear Mr. Ferry and Ms. Moorefield:

This Report contains my conclusions regarding Petitioner's Application for Rule to Show Cause filed under Title 12, Section 2702 of the Delaware Code. Petitioner asks the Court to compel Ms. Moorefield—the representative of the Estate of Reginald E. Watson, Sr. (the "Estate")—to sell the property known as 2601 Baxter Avenue, in Wilmington, Delaware (the "Property") to satisfy a debt of the Estate.

The Rule issued on January 31, 2025. I held an evidentiary hearing on July 16.[1] After considering the testimony and exhibits presented at the

---

[1] I held a status conference on April 2, 2025, and a show cause hearing was scheduled for May 19. Docket Items ("D.I.") 25; 26. I rescheduled the hearing to

hearing, as well as items on the Estate's docket in the Register of Wills and the docket in this civil action, I conclude that Respondent has not demonstrated sufficient cause for the Court to deny Petitioner's request. Accordingly, I recommend that Respondent, as Estate representative, be required to sell the Property.

I state the facts as I find them after the hearing, and my conclusions, below.

**The Parties**

Petitioner GitSit Solutions, LLC ("GitSit") is "a holder and servicer of home mortgages."[2] Petitioner is "the current and sole owner" of a note and mortgage executed by Reginald E. Watson, Sr. ("Decedent") in 2011.[3] Petitioner acquired the note and mortgage on January 24, 2024.[4]

---

June 2, at Respondent's request, due to personal difficulties, D.I. 27; 30, and ultimately to July 16, upon receipt of late-filed exhibits from Respondent. D.I. 34; 35. One week before the July 16 hearing, Respondent asked the Court to conduct an investigation into "serious irregularities" and "potential fraud" related to the transactions at issue in this matter. *See* Summary Assignments and Chains Fraud, D.I. 39 at 2. The Court does not conduct investigations.

[2] Transcript of July 16 Evidentiary Hearing ("Tr."), D.I. 41 at 58:21–22.

[3] *Id.* at 59:13–14, 60:7–9. Petitioner is the payee under the terms of the note and the holder of the mortgage. *Id.* at 59:17–20.

[4] *See IMO Watson Sr., Reginald E. (DOD 02/08/2021)*, ROW 186822 PJT (Del. Ch.), D.I. 26 (cited as the "Mortgage") at 27. The Court has taken judicial notice of the Mortgage and assignment documents. *See* D.R.E. 202(d)(1)(C).

Respondent Myesha Moorefield is Decedent's granddaughter and the successor personal representative of his Estate.[5] Respondent lived in the Property when she was a child,[6] and she remains a resident of Wilmington, Delaware.[7]

**Decedent and His Will**

Decedent executed a Will in 2010.[8] The Will named Decedent's son, Reginald E. Watson, Jr., as executor.[9] Decedent died on February 8, 2021.[10] Decedent's son did not open an estate.

For purposes of this Report, Decedent's Will did not "surface" until April 30, 2024.[11] The record does not reflect the location of the Will between

---

[5] Tr. at 11:2–12; 56:7–10.

[6] *See id.* at 106:8–9 ("This is my childhood home."); 109:9 ("I grew up in the house.").

[7] *Id.* at 9:15–18.

[8] *See* Petitioner's Exhibit ("PX") 4 at 9 ¶ A (Last Will and Testament of Reginald E. Watson).

[9] *Id.* at 15. Decedent's son renounced his power of administration effective June 5, 2024. *See Watson*, ROW 186822 PJT, D.I. 11. Respondent refers to Decedent's son as her uncle. Tr. at 14:4–6.

[10] Pet. for an Order for a R. to Show Cause ("Petition"), D.I. 1 ¶ 1; Tr. at 18:1–12.

[11] The Will was filed more than one month after Petitioner's then-counsel opened the Estate. *See Watson*, ROW 186822 PJT, D.I. 7. The reason for the delay does not appear in the record.

2021 and 2024. Respondent testified that she was not aware of the Will before 2024.[12]

**The Reverse Mortgage**

On March 9, 2011, nearly a decade before his death, Decedent entered into a fixed-rate home equity conversion loan, more commonly known as a reverse mortgage ("Mortgage").[13] In short, Decedent obtained a loan of up to $288,000, secured by the Property.[14] The Mortgage provided that, upon Decedent's death, the lender would be entitled to sell the Property in satisfaction of the loan.[15] The Mortgage is recorded in the land records of New Castle County.[16]

---

[12] Tr. at 114:8–10.

[13] Mortgage at 6.

[14] *See id.* at 7.

[15] *See id.* at 12 ¶ 10 ("Lender may enforce the debt only through sale of the Property.").

[16] *See id.* at 6; *see also* Tr. at 60:22–61:2 (relevant mortgage documents were recorded in New Castle County).

Reverse mortgages are federally insured.[17] Thus, Decedent's loan was originally evidenced by two mortgages -- one with the lending bank and one with the Department of Housing and Urban Development ("HUD").[18]

**The Assignments**

The Mortgage was assigned three times after 2011.[19] The assignments reflect that they have been recorded.[20] The final assignment was made by HUD, "by its attorney-in-fact GitSit Solutions, LLC" (the "POA"), to Petitioner.[21]

**Petitioner's First Attempt to Recover**

After acquiring the debt in January 2024, Petitioner retained counsel in Delaware to open an estate for Decedent and pursue a process of "special

---

[17] Tr. at 68:6–7.

[18] *Id.* at 68:6–68:18.

[19] Mortgage at 23–28 (reflecting assignments in 2012, 2018 and 2024). The documents and assignments, collectively, have not been consecutively numbered. The numbers stated here are the Court's count of the pages.

[20] *Id.* Petitioner's witness testified that the assignment to Petitioner is recorded. *See* Tr. at 60:10–20.

[21] Mortgage at 27. The documents also reflect that the POA was recorded. *See id.*

administration."[22]  In accordance with the terms of the Mortgage, Petitioner intended to sell the Property to satisfy the debt.[23]

Petitioner's then-counsel, Charles Knothe, opened Decedent's Estate on March 25 and became its first representative.[24]  Mr. Knothe filed an inventory representing that the Estate had one asset—the Property, valued at $290,000—and that Decedent had one next of kin—his son.[25]

Mr. Knothe negotiated a contract to sell the Property at a price below the amount of the debt, which Petitioner accepted.[26]  Unfortunately, Mr. Knothe died on September 16, and the sale did not occur.[27]

---

[22] *See* Tr. at 62:18–63:6.  *See also* 12 *Del. C.* § 1505(d), (e) (providing the Register of Wills discretion to grant letters testamentary to any interested person who seeks appointment, if no petition filed within 60 days of death).  At the hearing, Petitioner's witness explained the options of special administration and foreclosure, and why Petitioner prefers the former option.  Tr. at 85:14–86:3.

[23] *See* Tr. at 62:23–24.

[24] Petition, D.I. 1 ¶¶ 2; 6–7.  Mr. Knothe opened the Estate intestate and filed the Will later.  *Compare Watson*, ROW 186822 PJT, D.I. 1–5 (original petition with supplemental items) *with Watson*, ROW 186822 PJT, D.I. 7 (Decedent's Will).

[25] *Watson*, ROW 186822 PJT, D.I. 3.  *See* 12 *Del. C.* § 1905(c) (administrator must represent by affidavit that all known goods and real estate have been listed).  It is not clear how counsel determined the value of the Property.

[26] Tr. at 63:1–5.

[27] *Id.* at 63:4–6.

**Petitioner Regroups**

Petitioner retained new counsel shortly after Mr. Knothe's death.[28] Petitioner then contacted Respondent and other members of Decedent's family and "offered them the ability to renounce their right to take action so the property could be sold, in lieu of [Petitioner] having [Petitioner] having to go through foreclosure and personally name them in that foreclosure suit."[29]

Several family members renounced their interest in the Property, but Respondent did not.[30] Instead, Respondent petitioned to become successor personal representative of the Estate.[31] Respondent was appointed on

---

[28] *Id.* at 63:23–64:9. *See Watson*, ROW 186822 PJT, D.I. 18 (Counsel's Petition for Letters of Administration filed October 30, 2024).

[29] Tr. at 65:22–66:12.

[30] *Id.* at 66:13–17. Mr. Williams testified that Respondent's mother also declined. *Id.* at 66:16–17.

[31] *Id.* at 64:10–17. Ms. Moorefield had apparently been in touch with the Register of Wills in April of 2024 to discuss opening an estate. *See* PX 6. Respondent did not actually file a petition to do so, however, until December of that year. *See Watson*, ROW 186822 PJT, D.I. 22. Respondent sought appointment only after receiving notice that Petitioner's counsel had petitioned for appointment. *See* Tr. at 40:8–19.

December 5, 2024.[32] In March 2025, Respondent filed an inventory.[33] She copied Mr. Knothe's entries concerning the Estate's assets and value.[34]

**Petitioner Files A Claim**

On December 16, 2024, Petitioner filed a claim against the Estate.[35] Counsel represented that it did so to compel a response from Respondent.[36] Petitioner sent a copy of its claim and supporting documents to Respondent on December 23, 2024.[37]

On the date of filing, the debt stood at $302,779.05.[38] By the date of the hearing, with continued accrued interest, the debt had grown to

---

[32] Petition ¶ 12.

[33] *See generally Watson*, ROW 186822 PJT, D.I. 29.

[34] *See* Tr. at 23:8–10 ("I kind of just followed what [Mr. Knothe] put on there because, like I said, I am unaware of any knowledge of how any of this goes."). Respondent has acknowledged that there were other Estate assets at the time of Decedent's death. *See* Tr. at 19:6–21:17. Respondent was not a fiduciary at that time. I note that Respondent's opening petition for authority did not simply copy Mr. Knothe's original petition. *Compare Watson*, ROW 186822 PJT, D.I. 18, *with Watson*, ROW 186822 PJT, D.I. 22.

[35] Petition ¶ 14.; *see also* Tr. at 101:12-22. The claim was not filed within eight months of Decedent's death, but this is not fatal because the Mortgage was recorded. *See* 12 *Del. C.* § 2103.

[36] Tr. at 101:19–22.

[37] *See* PX 9. The enclosures to the letter are not included with the exhibit, but the Court accepts the implied representation that they were enclosed with the original letter Respondent received.

[38] Petition Ex. A (Statement of Claim).

$310,955.38.[39]  Respondent did not challenge the timing of the filing or Petitioner's evidence concerning the amount of the debt or the accrual of interest.

**The Hearing**

I heard from two witnesses at the hearing, Respondent and Evan Williams, an Asset Manager Team Lead at GitSit.[40]  In brief, Petitioner argued that it presented Respondent with evidence of the Mortgage, and Respondent could have corroborated the documents' validity by looking at the filings at the Register of Wills and the Register of Deeds.[41]  Petitioner argues that its claim is valid and asks the Court to order Respondent to sell the Property.[42]

Respondent had the burden to prove that there is just cause to avoid a court order to sell the Property.[43]  She attempted to meet that burden by

---

[39] Tr. at 61:3–6.

[40] *Id.* at 59:5–7.  Mr. Williams has been employed by GitSit for seventeen years.  *Id.* at 59:8–10.  The Court found Mr. Williams to be a knowledgeable and credible witness.

[41] *Id.* at 95:11–16 ("The stamped and recorded documents have been provided to Ms. Moorefield. She has had the opportunity to look at documentation with her own eyes at the Register of Wills, with the Recorder of Deeds, and she either has not done so or has chosen not to do so.").  *See also id.* at 93:23–94:1 ("She refuses to accept the valid legal documents that she has been presented with on multiple occasions.").

[42] *See id.* at 95:10–22.

[43] *See* 12 *Del. C.* § 2702.

proving that Petitioner's claim is invalid,[44] based on alleged defects in the documents[45] and misuse of the estate administration process.[46] Finally, Respondent testified to her history with and sincere desire to keep the Property. In addition to assessing the evidence concerning Petitioner's documents, I have synthesized Respondent's affirmative arguments with her answers on cross and consider them collectively as a request that the Court exercise discretion to decline to order a sale of the Property under Title 12, Section 2717 of the Delaware Code.[47]

---

[44] *See* Tr. at 51:16–19 (stating belief that claim is invalid).

[45] *See generally id.* 71:5–87:12 (examining Mr. Williams about alleged defects in the Mortgage and assignment documents). Respondent also asserted that Petitioner failed to provide certain required notices. *Id.* at 114:4–19. Respondent did not develop the argument or examine Petitioner on the subject.

The Court notes that Respondent submitted Exhibits A–F to Petitioners and the Court shortly before the original hearing date, but they were not placed on the docket at that time. Respondent questioned Mr. Williams about Exhibits A–C, but the Court failed to ask Respondent if she wished to move their admission. The same documents were included in Petitioner's Exhibits.

[46] *Id.* 114:4–19.

[47] Respondent did not cite this statute in her papers or at the hearing, but this appears to be the closest potential match for Respondent's argument. Section 2717 allows this Court to decline to "order [the] sale of real estate . . . , if under the circumstances it is considered improper that such sale should be made, although it should sufficiently appear that the personal estate is not sufficient for the payment of the debts, or that the sale was regularly conducted." *See* 12 *Del. C.* § 2717.

**Synthesis and Assessment**

Respondent has been skeptical of Petitioner's supporting documents.[48] She stated at least twice that she had no evidence that Decedent had taken out a loan, despite being presented with the Mortgage and assignment records.[49] This is partly because of the surrounding circumstances, discussed below, but Respondent also questioned Mr. Williams about perceived defects in the documents supporting Petitioner's claim.[50]

Respondent asked Mr. Williams why two mortgages were executed on the same date with the same number and why only one of the mortgages was

---

[48] *See, e.g.*, Tr. 81:4–15; 105:24–106:4; 106:12–14.

[49] *See, e.g., id.* 106:1–3 ("I don't have any proof besides the documents, you know, stating that there was a loan."); 106:12–14 ("I didn't have any evidence of any transfer or anything … saying that my grandfather even got the loan."). Yet, Respondent understood at some period of time that "the bank might own the [Property][.]" *Id.* at 109:9–13 (relaying comments from Respondent's uncle); 109:22–23 (thinking, after finding locks changed, "either my uncle has sold it or the bank has come to collect on it.").

[50] The Court notes that Respondent raised briefly with Mr. Williams the matter of notices allegedly required but not provided. *See id.* 81:4–15 (asserting that she did not receive evidence of the loan); 106:3–4 (stating "there were … some key points missing from the loan."). The Court also notes that Respondent submitted a purported "exhibit" listing other subjects of concern that she did not support with argument or raise with Mr. Williams. Assuming, *arguendo*, that those arguments were "raised," the Court now considers them waived. *See* Tr. at 82:4–5 ("Do you want to keep asking questions of Mr. Williams or are you ready to turn to the next phase?"); 84:3–5 ("Ms. Moorefield, if you do not have more questions for Mr. Williams, we can all stay together and talk about what happens next.").

found to have been satisfied.[51]  Mr. Williams testified that having a second mortgage is standard industry practice, and that it exists to protect HUD.[52]  He explained that the second mortgage was marked satisfied because HUD had not been required to step in and fulfill the first bank's obligation to disburse the principal to Decedent.[53]

Respondent also challenged the validity and effectiveness of the assignment documents.  Respondent questioned Mr. Williams about missing dates on the allonges, which suggested the possibility of fraud.[54]  Mr. Williams testified that allonges are not required to be dated and that the undated allonges in this case reflect standard industry practice.[55]  Respondent asked why HUD was able to transfer the debt if HUD's mortgage had been marked satisfied,[56] why GitSit acted for HUD,[57] and why GitSit was "allowed to sign

---

[51] Tr. at 71:5–15.

[52] *See id.* at 68:3–69:7.

[53] *See id.* at 71:16–72:12.

[54] *See id.* at 74:7–78:10. Respondent noted that, without a date, she "could put [an undated allonge] on [her] printer and type [it] up." *Id.* at 78:8–10.

[55] *See id.* at 69:9–70:10; 76:3–79:4.

[56] *See id.* at 73:6–7.

[57] Respondent misunderstood this to mean that HUD was GitSit's agent, not the other way around. *See id.* at 72:19–21.

[the debt] over to [itself.]"[58]  Mr. Williams explained that GitSit acted for HUD by virtue of the POA and that the POA exists for HUD's convenience.[59] HUD receives large quantities of mortgages and does not want to be responsible for signing to release them.[60]  Mr. Williams testified that the arrangement gives Petitioner no benefit aside from being able to "release HUD's security in the home."[61]

In addition to attacking Petitioner's documents, Respondent gave testimony about her perspective on the events relating to the Property, as well as her history with and sincere attachment to the Property.  Respondent was surprised to learn that Decedent's son had not probated the Estate at the time of Decedent's death.[62]  She was skeptical that a stranger to Decedent would

---

[58] *Id.* at 73:21. This was Respondent's perception of the documents.  *See id.* at 72:15–74:6.

[59] *See id.* at 73:8–14.  The POA is recorded.  *See id.* at 74:1–6.

[60] *Id.* at 73:11–16.

[61] *Id.* at 73:14–19.

[62] *See id.* at 13:24–14:3 ("From my understanding, my uncle was supposed to handle all the affairs."); 22:12–15 ("I assumed after three years th[e] [Estate] would be closed.  And . . . I assumed that my uncle took care of what he needed to take care of as far as that.").

be permitted to open his Estate.[63]  The delay between Decedent's death and Petitioner's actions also raised concerns.[64]

The Property is Respondent's childhood home.[65]  Respondent wants to keep the Property, and she gave testimony about her recent efforts to take responsibility.  Respondent has visited the Property and paid associated bills with her personal funds.[66]  She made overtures to Petitioner to acquire the Property.[67]  Respondent's strong emotional attachment to the Property was evident at the hearing.

---

[63] *Id.* at 85:6–8; 86:15–18.

[64] *Id.* at 114:5–10 ("[I]f any of this was supposed to occur after he passed away, why did it take up to three years for anyone to come and make me aware or make the estate aware of any of this?").

[65] *Id.* at 106:8–9 ("This is my childhood home.  I've never seen myself without it."). Respondent testified that Decedent wanted the Property to be "the family house." *Id.* at 109:9–11. Petitioner did not object to this testimony. It is not necessary to my recommendations in any event.

[66] Respondent has been visiting the Property and paying for upkeep. *See id.* at 12:1–13:21. It is not clear how or when Respondent obtained access to the Property. *Cf. id.* at 109:19–21 ("[A]fter he passed away, I was still[] going to the house.  And then when I came there one day, the locks were changed.").

[67] Respondent proposed a payment plan, which Petitioner rejected. *Id.* at 49:13–17; *see also* Response to the Petition for an Order for a Rule to Show Cause ("Response"), D.I. 17 ¶ 17 ("I offered to start making repayment of the debt if able to keep the Property as I was unaware that [there] was maybe debt until after [Decedent's] passing[.]").  Respondent later sent a "Tender of Payment." Response, D.I. 18. Respondent appears to have misunderstood the requirements for and implications of using the latter instrument. Tr. at 48:5–22; 50:5–52:8.

I conclude that Respondent petitioned to become administrator of the Estate both to act responsibly where other family members appear to have failed and because she perceived it to be a way she might avoid a sale of the Property. Understandably, Respondent struggled to make sense of the legal landscape on both fronts.[68]

I understand why a layperson might be skeptical that a stranger to a family could open an estate years after a death and assert a claim to an asset. Petitioner provided supporting documents, but they are not easily decipherable by a layperson.[69] I understand why a layperson would want to test the legitimacy of a claimant's documents before walking away.

---

[68] Respondent has no prior experience with mortgages. Tr. at 57:17–19. She has never administered an estate. *Id.* at 10:13–16. She is unfamiliar with the executor's role and purpose of the inventory. *See, e.g., id.* at 22:16–23:10 (discussing nature of inventory and Respondent's role); 16:11–17:23 (Respondent believed uncle to be the estate representative); 32:19–23 (Respondent has not considered amending inventory); 42:21–43:16 (Respondent unaware that Mr. Knothe was Estate representative). Respondent also testified to her limited familiarity with financial and real estate assets. *See id.* at 81:4–83:20. She did not appear to fully understand her "Tender of Payment." *See id.* at 49:21–52:1.

[69] Mr. Williams noted at several points that the mortgage process and documents are difficult for the uninitiated to understand. *See, e.g.*, *id.* at 74:10–76:7 (testifying to lack of break in assignment chain and conceding that explanation is "incredibly complex"); 78:4–17 (explaining industry practice regarding allonges and describing concepts as "abstract"); 82:20– 83:20 (stating that many family members have questioned the recording of two mortgages and that he had similar questions when he was new to his field).

Nevertheless, Respondent did not call the validity of the Mortgage and assignments into serious question, and she has not convinced me that there is any just cause to decline to order the sale of the Property. Ultimately, the law is not on Respondent's side. Decedent entered into a reverse mortgage in exchange for up to $288,000 to use during his lifetime.[70] Decedent agreed that, upon his death, the noteholder would have an immediate right to claim ownership of and sell the Property.[71] This is the only remedy Petitioner has under the contract.[72]

Based on the foregoing findings, I conclude that the Estate's assets are insufficient to pay its debts.[73] I recommend that the Court require Respondent to sell the Property to satisfy Petitioner's claim.[74]

---

[70] *See generally* Mortgage and related documents.

[71] *See id.* at 10 ¶ 9.

[72] *See id.* at 12 ¶ 10 ("Lender may enforce the debt only through sale of the Property."). Foreclosure is an available non-contract remedy, but Petitioner elected not to pursue that path for reasons Mr. Williams explained at the hearing. Tr. at 85:14–86:3. Requiring Petitioner to pursue that path now would impose delays and costs that would be unfair. *See id.* at 67:1–7; 103:2–10.

[73] There are additional Estate assets, but as described at the hearing, there is no reason to believe that they would have sufficient value to enable the Estate to pay Petitioner's claim. *See* Tr. at 20:14–18 (uncle may have jewelry); 21:1–4 (describing furniture in storage).

[74] If Petitioner intended to make an oral motion for fees and costs, I decline to consider that motion at this stage. *See id.* at 95:3–9. I note that the Petition did not include a request for fees. *See* D.I. 1.

**Next Steps**

It appears that a sale of the Property can proceed promptly because there is a potential buyer. In September 2024, Mr. Knothe entered into a contract to sell the Property to a third party, Mr. Pizano.[75] At the hearing, Mr. Williams testified that Mr. Pizano, and his realtor, recently confirmed Mr. Pizano's continued willingness to buy the Property.[76] Petitioner's counsel, likewise, represented that Mr. Pizano's realtor had confirmed his client's continued interest in the Property.[77] Counsel suggested that this path would be desirable because it is likely to be easiest.[78] He also suggested that there may be legal liability for the Estate if the sale is not pursued.[79] I make no findings concerning the contract or any potential for liability.

It would be in both parties' interest to sell the Property in a simple and efficient manner. If a sale to Mr. Pizano under the September 2024 contract is available and is efficient the parties may attempt to move forward with that

---

[75] *See generally* Petition Ex. C (contract of sale).

[76] Tr. at 63:10–15.

[77] *Id*. at 98:22–99:4.

[78] *Id*. at 97:7–8. At other times, he indicated that a simple order compelling a sale of the Property would be satisfactory. *See id*. at 98:2–5.

[79] *Id*. at 54:19–55:18. On the other hand, counsel also suggested that the potential buyer is not likely to devote resources to this course of action. *Id*. at 98:6–9.

opportunity. If problems should arise in connection with that sale, I am hopeful that the parties will work together to find a suitable alternative.

**Conclusion**

For the reasons stated in this Report, I conclude that Respondent must sell the Property to satisfy Petitioner's claim. Respondent must present to the Court as soon as reasonably possible a petition to sell the Property that complies with Title 12, Section 2701 of the Delaware Code.

This is a Final Report. Any party wishing to file exceptions must do so within 11 days and follow Court of Chancery Rule 144.

**IT IS SO ORDERED.**

Very truly yours,

/s/ *Danielle Gibbs*

Magistrate in Chancery